UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

UNITED STATES OF AMERICA,

                                                                                                             23 Cr. 207 (LJL)

                   -against-

DANIELLE SIEGEL,

                                                                     Defendant.

------------------------------------------------------------------------ x


## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF PRETRIAL MOTION TO SUPPRESS


MICHAEL HUESTON, ESQ.
16 Court Street, 35th Floor
Brooklyn, New York 11241
(718) 246-2900

GILBERT S. BAYONNE, ESQ.
1850 Amsterdam Ave, Suite 2s
New York, NY 10031
(929) 333-6497

*Counsel for Danielle Siegel*

Dated: November 16, 2023

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 2

I. Trash Cover" evidence should be suppressed, or in the alternative, a hearing should be ordered to determine its admissibility ........ 2

A. Statement of Facts ........ 2

B. Applicable Law ........ 4

C. Discussion ........ 7

CONCLUSION ........ 9

## TABLE OF AUTHORITIES

**CASES**           **Page**

*California v. Ciraolo*,
    476 U.S. 207 (1986) ........................................................................................................4

*Florida v. Jardines*,
    569 U.S. 1 (2013) ................................................................................................... passim

*Harris v. O'Hare*,
    770 F.3d 224 (2d Cir. 2014) .........................................................................................5, 8

*Katz v. United States*,
    389 U.S. 347 (1967) ........................................................................................................4

*United States v. Bedell*,
    311 Fed. App'x 461 (2d Cir. 2009) ..............................................................................6, 8

*Fixel v. Wainright*,
    492 F.2d 480 (5th Cir. 1974) ..........................................................................................7

*Watkins v. Sowders*,
    449 U.S. 341 (1981) ........................................................................................................9

*United States v. Archibald*,
    734 F.2d. 938 (2d. Cir. 1984),
    *modified on other grounds*, 756 F.2d. 223 (2d. Cir. 1984) ....................................9

*United States v. Gori*,
    230 F.3d 44 (2d Cir. 2000) ..........................................................................................4, 5

*United States v. Holland*,
    755 F.2d 253 (2d. Cir. 1985) ..........................................................................................7

*United States v. Iverson*,
    897 F.3d 450 (2d Cir. 2018) ...........................................................................................4

*United States v. Levasseur*,
    816 F.2d 37 (2d Cir. 1987) .............................................................................................5

*United States v. Lewis*,
    62 F.4th 733 (2d Cir. 2023) ............................................................................................6

**CONSTITUTIONAL PROVISIONS AND OTHER AUTHORITIES**

U.S. Const. amend. IV ............................................................................................................8

Carrie Leonetti, *Open Fields in the Inner City: Application of the Curtilage Doctrine to Urban and Suburban Areas*, 15 Geo. Mason U. Civ. Rts. L.J. 297 (2005) ....................................................................8, 9

Kathryn E. Fifield, *Let This Jardines Grow: The Case for Curtilage Protection in Common Spaces*, 2017 Wis. L. Rev. 147 (2017) ............................................................................................8

U.S. Const. amend. IV ................................................................................................8

iii

## PRELIMINARY STATEMENT

This memorandum of law is submitted to support the pretrial motion filed for defendant Danielle Siegel seeking (1) an order suppressing seized "Trash Cover" evidence or, in the alternative, a hearing to determine its admissibility at trial.

We refer the Court to the accompanying declarations of Ms. Siegel ("Siegel Decl.") and Michael Hueston, Esq. ("Hueston Decl."), and the attached exhibits, which provide information pertinent to the issues discussed here.

Generally, Ms. Siegel is charged in the indictment with a "COVID-19 Vaccination Card Fraud Scheme" and "COVID-19 Test Fraud Scheme". *See* Indictment, Doc. 1 at ¶¶ 1-35.

Count One (Forgery of Government Writings) charges Ms. Siegel with forging COVID-19 vaccination record cards to defraud the United States from June 2021 through October 2021 in this District and elsewhere in violation of 18 U.S.C §§ 494 and 2. Indictment at ¶¶ 36-37.

Count Two (Fraud in Connection with Identification Documents) charges Ms. Siegel with unlawfully using, while affecting interstate and foreign commerce, other persons' names and dates of birth to forge COVID-19 vaccination cards for which she received over $1,000 in one year from June 2021 through October 2021 in this District and elsewhere in violation of 18 U.S.C §§ 1028(a)(7), 1028(b)(1)(D), and 2. Indictment at ¶¶ 38-39.

Count Three (False Statements) charges Ms. Siegel with falsely stating on February 7, 2022, to a federal special agent that she had never sold any COVID-19 vaccination record cards in this District and elsewhere in violation of 18 U.S.C 1001(a)(2). Indictment at ¶¶ 40-41.

Count Four (Health Care Fraud) charges Ms. Siegel with a scheme to submit fraudulent COVID-19 tests to healthcare benefit programs and health insurance companies to obtain money from January 2021 through February 2022 in this District and elsewhere.  Indictment at ¶¶ 42-43.

## ARGUMENT

**I.      All "Trash Cover" evidence should be suppressed, or in the alternative, a hearing should be ordered to determine its admissibility**

   **A.      Statement of Facts**

Ms. Siegel moves to suppress all "Trash Cover" evidence seized without warrants on January 25, 2022, and February 1, 2022, from 4240 157th Street, Flushing, New York 11355 (the "apartment building") on the basis that she is entitled to Fourth Amendment protection in the area before the apartment building where the activities of her home life extended.  On January 25, 2022, and February 1, 2022, Ms. Siegel resided at the apartment building.  *See* Siegel Decl.

According to investigation reports, *see* Exhibits 1-5 attached to Hueston Decl., on January 25, 2022, and February 1, 2022 special agents of the Federal Bureau of Investigation searched the trash from the apartment building without warrants and recovered among other items: "biological material", "urine sample cups", "multiple restaurant and food receipts for DANIELLE C and Zeke C", "USPS and AMAZON package labels addressed to DANIELLE COHEN", "NORTHWELL LAB Packing List address to HEALTH CARE LOGICS", "Swab testing instructions cards with HEALTHCARE LOGICS logo and website listed", "200 clear vials with a cotton swab inside", "10 used Covid-19 rapid test", "Paper documents addressed to THOMAS GORDAN NESSLER, MD", "Lap report addressed to HEALTHCARE LOGICS and

2

NESSLER, THOMAS MD", "Unused needle and tubing in plastic wrapping", "Cigna Insurance claim information with provider listed as YEHUDA BEN HAIM, MD and subscriber listed as DANIELLE COHEN", and "Swab testing instruction cards with HEALTHCARE LOGICS logo and website listed".

Before the searches, a supervisor instructed the agents: "You need SSA approval to go through someone's trash. *See* DIOG 18.6.12.5. … You should not retrieve the trash from an area where the subject has a reasonable expectation of privacy (e.g., walk up a driveway, to a rear of the house, into a garage etc." *See* Exhibit 1.

"DIOG" is an acronym for the FBI's Domestic Investigations and Operations Guide.[1] In part, the guide defines a "Trash Cover" as: "The intentional search of a specific person's trash (that is located at the place for collection), whether from a home or business, designed to find information relevant to an ongoing investigation when no reasonable expectation of privacy exists."[2] The guide lists the following four factors for the determination of an area of curtilage around a home: "(i) proximity of the area to the home; (ii) whether the area is within an enclosure surrounding the home; (iii) nature of the use to which the area is put; (iv) steps taken to protect the area from observation by passersby."[3] It also provides: "An area is curtilage if it is so intimately tied to the home itself that it should be placed on the umbrella of Fourth Amendment Protection."[4]

---

[1] FBI's Domestic Investigations and Operations Guide, https://vault.fbi.gov/FBI%20Domestic%20Investigations%20and%20Operations%20Guide%20%28DIOG%29 at 18-154.

[2] *Id.*, DIOG 18.6.12.4.1 at 18-153-54.

[3] *Id.*, DIOG 18.6.12.4.2 at 18-154.

[4] *Id.*

3

As demonstrated in a photo taken by the government, the trash collection area of the apartment building was at the end of a driveway outside a brown garage door. *See* Hueston Decl. at ¶ 7. The photo shows an open fence at the beginning of the driveway. *Id.*

B.   **Applicable Law**

The Supreme Court has articulated two tests to determine when a search occurs within the meaning of the Fourth Amendment. The first, the "property rights baseline" test, recognizes a search when the government obtains information by physically intruding on persons, houses, papers, or effects. *Florida v. Jardines*, 569 U.S. 1, 5 (2013). This language tracks the categories listed in the Fourth Amendment. *See* U.S. Const. amend. IV. One advantage of this test is that it "keeps easy cases easy" through a bright-line rule of general application. *Jardines*, 569 U.S. at 11.

The second test protects a more nuanced realm of interests. It forbids warrantless searches that violate a person's reasonable expectation of privacy. *See Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, *J.*, concurring). Courts employ a two-part inquiry to assess the legitimacy of a privacy expectation: "first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *California v. Ciraolo*, 476 U.S. 207, 211 (1986). Searches conducted pursuant to a defendant's consent, observations of items in plain view (or plain hearing, smell, or feel), and recoveries of abandoned property are not protected by the Fourth Amendment under this test. *See United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018); *United States v.*

4

*Gori*, 230 F.3d 44, 50 (2d Cir. 2000); *United States v. Levasseur*, 816 F.2d 37, 44 (2d Cir. 1987).

The curtilage, that "area adjacent to the home and to which the activity of home life extends", is considered part of a person's home and enjoys the same protection against unreasonable searches as the home itself. *Jardines*, 569 U.S. at 7 (internal quotation marks omitted). As a result, a search of the curtilage that occurs without a warrant based on probable cause or an exception to the warrant requirement violates the Fourth Amendment. *Harris v. O'Hare*, 770 F.3d 224, 234, 240 (2d Cir. 2014). By contrast, that portion of private property that extends outside a home's curtilage – what the caselaw terms an "open field" – is beyond the purview of the Fourth Amendment, and can be warrantlessly and suspicionlessly searched without constitutional impediment. *Jardines*, 569 U.S. at 6.

In *Jardines*, the Supreme Court held that an unconstitutional search occurred on the defendant's front porch, which was visible and accessible to the public. 569 U.S. at 1. The Court explained that a Fourth Amendment search occurs when police "gather []  information" by "physically entering and occupying" a portion of the curtilage to "engage in conduct not explicitly or implicitly permitted by the homeowner." *Jardines*, at 5-6. Because homeowners do not invite or expect officers to come to their homes in "hopes of discovering incriminating evidence," officers may not constitutionally go to a location, even if it is "typically" used by visitors, if their behavior "objectively reveals a purpose to conduct a search." *Id.* at 9-10 (analyzing whether the officers had an "implied license" to enter the porch based on the "purpose for which they entered"). In holding a warrantless

5

dog sniff from the defendant's front porch was unconstitutional, the Court did not find it relevant that the porch was accessible to the public. *Jardines*, 569 U.S. at 1.

Even the *Jardines* dissenters explained that police cannot go to the front door or someone's home "in the middle of the night without an express invitation," and could not "traipse through the garden, meander into the backyard, or take other circuitous detours that veer from the pathway that a visitor would customarily use." *Id.* at 18-22.

As for the common area doctrine, we acknowledge that in *United States v. Lewis*, 62 F.4th 733, 739 (2d Cir. 2023), the Second Circuit recently upheld a district's ruling that the defendant bears the burden of proving she has a legitimate expectation of privacy in the area intruded upon and that "[i]t is well-settled in the Second Circuit that because an individual has no power to exclude another from a common area, a defendant has no legitimate expectation of privacy in [] 'a common area that's accessible to the other tenants in [a] multifamily apartment building.'" (quoting *United States v. Jones*, 893 F.3d 66, 72 (2d Cir. 2018) (internal citations modified).

However, in *United States v. Bedell*, 311 Fed. App'x 461, 463 n.3 (2d Cir. 2009), the Circuit emphasized that the mere fact that the defendant occupied a room in a multi-tenant facility was "insufficient to allow the *per se* conclusion that [the defendant] did *not* have a reasonable expectation of privacy in the hallway" common to other tenants. The Court noted that while "[f]amiliarity with suppression issues may lead a court instinctively to categorize cases as triggering Fourth Amendment presumptions for searches of . . . the 'common hallways' of an apartment building," *id.* (citing *United States v. Holland*, 755 F.2d [253, 255-56 (2d. Cir. 1985)], "[t]he fact that a given location is a 'rooming house' or a 'multi-tenant dwelling,' however, does not in itself dictate what

reasonable expectations of privacy tenants have in common areas." *Id*.  Rather, the Court instructed courts to "undertake individualized inquiries into the facts of such cases." *Id*.; *see also United States v. Sykes*, 304 Fed. App'x 10, 13 (2d Cir. 2008) (noting that "[t]he curtilage analysis of a unit within a multi-family dwelling will . . . depend on the degree of privacy tenants of that particular multi- family dwelling can reasonably expect in a particular location on the premises" and citing *Fixel v. Wainright*, 492 F.2d 480, 484 (5th Cir. 1974), for the proposition that a "defendant could 'reasonably expect privacy' in the backyard area of a multi-unit residence where the backyard was 'sufficiently removed and private in character'").

      C.     **Discussion**

The government has produced reports concerning the January 25, 2022, and February 1, 2022, "Trash Cover" searches.  Exhibits 1-5.  However, the reports fail to state where the trash cans were located on the dates of the searches or whether agents took photographs of the trash cans on the dates of the searches.

As mentioned, the agents were instructed: "You should not retrieve the trash from an area where the subject has a reasonable expectation of privacy (e.g., walk up a driveway, to a rear of the house, into a garage etc." *See* Exhibit 1.  As mentioned, the FBI's guide states that curtilage is determined, in relevant part, by the "proximity of the area to the home", "whether the area is within an enclosure surrounding the home" and the "nature of the use to which the area is put".[5]  Also, the photograph of the apartment

---

[5]FBI's Domestic Investigations and Operations Guide, https://vault.fbi.gov/FBI%20Domestic%20Investigations%20and%20Operations%20Guide%20%28DIOG%29, DIOG 18.6.12.4.2 at 18-154.

7

building shows trash cans at the end of a gated driveway and in front of a closed garage door.  Hueston Decl. at ¶ 7.

Searching the trash cans by the garage door would have violated the FBI's guidelines and Ms. Siegel's reasonable expectations of privacy, as the agents would have undoubtedly been illegally on the curtilage.  *See Jardines*, 569 U.S. at 1; and *Harris,* at 234, 240.  Indeed, as the panel in *Bedell* recognized, there is no "*per se* conclusion" rule that a defendant does not have a reasonable expectation of privacy in a common area, 311 Fed. App'x at 463 n.2, and as the panel in  *Sykes*, 304 Fed. App'x at 13 stated, "[t]he curtilage analysis of a unit within a multi-family dwelling will . . . depend on the degree of privacy tenants of that particular multi-family dwelling can reasonably expect in a particular location on the premises."

The residents of a multi-family dwelling are afforded a degree of privacy in their common curtilage.  *See* Kathryn E. Fifield, *Let This Jardines Grow: The Case for Curtilage Protection in Common Spaces*, 2017 Wis. L. Rev. 147, 175 (2017) (noting that "[r]esidents of poor neighborhoods," in which multi-family homes are more common, "generally experience far less Fourth Amendment protection than their wealthier peers" and arguing that the right to exclude another from a common area should no longer dictate the outcome of the Fourth Amendment inquiry post-*Jardines*); *see also* Carrie Leonetti, *Open Fields in the Inner City: Application of the Curtilage Doctrine to Urban and Suburban Areas*, 15 Geo. Mason U. Civ. Rts. L.J. 297, 317 (2005) ("If privacy is confined only to areas that are exclusively occupied by a single tenant, then most Americans would be left with only a few hundred square feet in which to confine themselves from the increasing governmental intrusions of modern life.  This mistakenly

8

ignores the collective right that the residents of an apartment building, condominium complex, or hotel have to exclude all individuals that do not have a legitimate purpose there.").

It is immaterial to this analysis that we are discussing abandoned trash because the issue is properly framed as whether the agents could come onto the curtilage to retrieve it. *See Jardines*, 569 U.S. at 1. Accordingly, this Court should suppress all evidence illegally seized from "Trash Covers" as well as any evidence derived from the unlawful fruits of these illegal seizures.

In the alternative, Ms. Siegel requests the opportunity to put the government to its proof at an evidentiary hearing as a "judicial determination outside the presence of the jury of … evidence may often be advisable" and "constitutionally necessary." *Watkins v. Sowders*, 449 U.S. 341, 349 (1981) (discussing identification hearing); *see, e.g., United States v. Archibald*, 734 F.2d. 938, 940 (2d. Cir. 1984), *modified on other grounds*, 756 F.2d. 223 (2d. Cir. 1984) (while failure to hold hearing outside presence of the jury was not error, "we think it would have been preferable").

## **CONCLUSION**

For the reasons set forth herein, defendant's motion should be granted.

Dated:     Brooklyn, New York
           November 16, 2023

                              Respectfully submitted,

                              ___s/_____
                              MICHAEL HUESTON, ESQ.
                              GILBERT S. BAYONNE, ESQ.