

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 6, 2024

**BY ECF**
The Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:   *United States v. Danielle Siegel*, a/k/a *"Danielle Cohen,"* 23 Cr. 207 (LJL)

Dear Judge Liman:

      The Government respectfully submits this letter in advance of the sentencing for defendant Danielle Siegel in the above-referenced matter, which is scheduled for September 13, 2024, at 2:00 p.m. During the height of the Delta wave of the COVID-19 pandemic, the defendant sold fraudulent COVID-19 vaccination record cards and test results to individuals who had not, in fact, received COVID-19 vaccinations or the test results indicated. For the reasons set forth below, including the public health dangers of this conduct during the peak of the pandemic, the Government respectfully submits that a sentence within the Guidelines range of six to 12 months' imprisonment is sufficient but not greater than necessary to serve the purposes of sentencing in this case.

    **I.**    **Background**

       **A. The COVID-19 Outbreak and the Federal Government's Response**

      In or about early 2020, COVID-19 began spreading in the United States. By March 13, 2020, the disease had killed over one million Americans, leading the President to declare a state of national emergency. (Presentence Investigation Report ("PSR") ¶ 12). In response to the pandemic, the federal government began funding vaccine development. (PSR ¶ 13). As companies developed vaccines, these vaccines were approved by the Federal Drug Administration ("FDA"), and the Centers for Disease Control ("CDC"), a division within the department of Health and Human Services ("HHS"), began to prepare to distribute the vaccines. (PSR ¶¶ 13-14).

      As part of the CDC's vaccine distribution scheme, healthcare providers were required to distribute COVID-19 vaccination record cards to each recipient of the COVID-19 vaccine. (PSR ¶ 15). These cards contained, among other things, the CDC and HHS logos and listed the name and date of birth of the individual receiving the vaccine, the name of the manufacturer of the vaccine administered, the lot number of the vaccine dose, and the date when and location where each dose was administered. (PSR ¶ 15). Providers were also required to enter information about their distribution of COVID-19 vaccines in state and local databases soon after vaccines were

distributed. (*See* PSR ¶ 16). Early on in the pandemic, providers could not charge patients for the COVID-19 vaccine, although they could seek reimbursement for administrative fees for the vaccine distribution from health insurance plans and from the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program (the "Uninsured Program"), which was administered by the Health Resources Services Administration ("HRSA"), another division of HHS. (*See* PSR ¶ 17).

In addition to overseeing the distribution of COVID-19 vaccines, the CDC also sought to control the spread of COVID-19 through COVID-19 testing. (PSR ¶ 18). As with the COVID-19 vaccinations, healthcare providers who administered COVID-19 tests could seek reimbursement from public or private health insurance plans for COVID-19 testing, including from HRSA's Uninsured Program. (PSR ¶ 19).

By June 2021, the COVID-19 Delta variant was spreading rapidly through the United States. (PSR ¶ 20). Its transmission peaked in or about early September 2021, with as many as 160,000 new COVID-19 infections occurring per day. (PSR ¶ 20). In or about August and September 2021, in response to the Delta wave, the President announced several COVID-19 vaccine and testing requirements. (PSR ¶ 21). These included, among other things, that the following groups of people be vaccinated or, in certain cases, receive weekly negative tests: (i) all employees who treated Medicare and Medicaid patients in nursing homes, hospitals, home healthcare facilities, and other medical facilities; (ii) all executive branch employees; (iii) all federal contractors; and (iv) all private employers with 100 or more employees. (PSR ¶ 21). Most of these requirements were set to take effect in or about January 2022. (PSR ¶ 21). The President encouraged, but did not require, those operating large public entertainment venues, such as sporting arenas, concert venues, and movie theaters, to require proof of vaccination or a negative test. (PSR ¶ 21). The President also announced that the federal government would use the Defense Production Act to increase the production of at-home COVID-19 rapid tests and that the federal government had worked with retailers and pharmacies to decrease the cost of COVID-19 testing to consumers. (PSR ¶ 22). In addition to these new requirements, prior requirements for travelers also remained in effect. These included a January 2021 CDC requirement that all international passengers traveling to the United States had to provide either (i) a pre-departure negative COVID-19 test result, or (ii) proof of a recent positive COVID-19 test and a letter from a healthcare provider or public health official stating that the patient was cleared to travel. (PSR ¶ 18).

### B. The Defendant's Vaccination Card and Testing Fraud Schemes

Beginning in or about 2019, the defendant was employed by her own healthcare company, Healthcare Logics LLC ("Healthcare Logics"), for which she was the Chief Operating Officer. (*See* PSR ¶¶ 24, 122). While working for Healthcare Logics and offering medical advice to her customers, the defendant claimed to be a nurse, even though she did not have a nursing license. (*See* PSR ¶¶ 24, 112). During the pandemic, the defendant connected with customers through Healthcare Logics, to whom she sold fraudulent vaccination record cards and/or fraudulent COVID-19 test results.

### 1. The Fraudulent Vaccination Card Scheme

From at least in or about June 2021 through in or about October 2021, the defendant, using her position at Healthcare Logics, sold forged COVID-19 vaccination record cards to individuals who had not, in fact, received a COVID-19 vaccine. (PSR ¶ 23). In doing so, the defendant fraudulently obstructed HHS and the CDC's administration and distribution of COVID-19 vaccines. (PSR ¶ 23). During the time of the scheme, the defendant sold at least 250 COVID-19 vaccination cards and made over $50,000 in connection with selling those forged cards. (PSR ¶ 36).

To successfully sell the cards, the defendant developed a system to recruit trusted customers, which involved relying on referrals from others before engaging substantively with a prospective customer. (*See* PSR ¶ 26). The defendant charged approximately $100 per fake shot, which generally meant that the fraudulent card cost $200, as she was primarily providing cards for two-dose vaccines like those manufactured by Pfizer and Moderna. (PSR ¶ 28). After the defendant received proof of payment, she provided the customer with a forged card, reflecting the dates on which the customer supposedly received the vaccine. (PSR ¶ 29). Some of these are obviously fraudulent on their face, reflecting, for example, dates of vaccination before the customer had even contacted the defendant. (PSR ¶ 29). The defendant typically provided the customer's digital vaccination cards, on which the customer's information was typed (PSR ¶ 30); examples of the defendant's forged digital cards are pictured below:



Some customers expressed frustration with the defendant's practice of providing forged digital cards, wanting physical cards. (*See* PSR ¶¶ 30-31). For example, after receiving a number of forged digital vaccination cards for a group that was traveling, one customer asked the defendant, "[W]hat about the original cards? I tried to make a copy and it doesn't look real. . . . do you have cards for us? We are traveling in 2 weeks and feel the cards are important. You can send us blank," meaning blank cards to be filled in. (PSR ¶ 30). The customer continued, "airports etc . . . want to see the cards. That's really what we paid for." (PSR ¶ 30).

When the defendant was providing these cards to customers, she knew that they were using the cards to circumvent a variety of vaccine requirements—many imposed to curb the rapidly spreading and deadly Delta wave—including requirements for international travel, employment, schooling, and entertainment. (PSR ¶¶ 31, 32). The defendant knew these customers were, for example, using the cards to enter or engage in—despite vaccine mandates—colleges in New York, employment on Broadway, and foreign countries, including Israel and Canada. One group of customers even informed the defendant that they were "healthcare workers with a state and federal

mandate" and asked her to "[p]lease provide the handwritten cards to us. We are running out of time." (PSR ¶ 33).

When she was selling the fraudulent COVID-19 vaccination record cards, the defendant knew what she was doing was wrong. Her own words demonstrated this: when a customer interested in purchasing a forged COVID-19 vaccination card for her son encouraged the defendant to be more direct in order to help others who were supposedly scared of the vaccine, the defendant said that she "[c]an't be too open about it unfortunately." (PSR ¶ 27). Similarly, on or about February 7, 2022, despite selling hundreds of fraudulent COVID-19 vaccination cards, she told federal law enforcement agents, in sum and substance, that she had never sold any COVID-19 vaccination records cards. (PSR ¶ 37). During the course of the scheme, the defendant also expressed, both to her customers and on social media, her disagreement with the COVID-19 vaccine and with governmental mandates to take the vaccine. (PSR ¶ 35). For example, the defendant posted on her LinkedIn account, "Most aren't vaxxing against COVID, most are vaxxing against unemployment, loss of travel, or other government restrictions . . . So what's more dangerous: the virus or the government?" (PSR ¶ 35).

### 2. The Fraudulent Testing Scheme

From at least in or about January 2021 through in or about February 2022, the defendant also sold fraudulent COVID-19 test results to individuals who had not, in fact, received those test results (and had not been tested at all). (PSR ¶ 38). During the course of the scheme, the defendant provided at least 40 fraudulent COVID-19 test results, charged approximately $100 per fraudulent test result, and received reimbursements from private insurance and HRSA for some of those fraudulent tests. (*See* PSR ¶¶ 44-46). During this time, Healthcare Logics provided COVID-19 testing and was in the top 20% of providers who received reimbursements from HRSA for testing, receiving over $863,000. (PSR ¶ 24).

As part of this testing scheme, the defendant offered to provide fake "proof of recovery" from COVID-19 to her scheme customers. (PSR ¶ 39). In practice, that meant the defendant would provide the scheme customer with a positive COVID-19 PCR test result, which was backdated months or weeks before the scheme customer's request for a supposed test. (PSR ¶ 39). The defendant intended the backdated positive PCR test results to assist her customers in participating in a variety of activities, including international travel in violation of the CDC's air travel testing requirements. (PSR ¶ 40). For example, on or about July 14, 2021, a customer sent the defendant a voice memo via WhatsApp, in which the customer said, in sum and substance, that she wanted a "positive one"—meaning a positive COVID-19 test result—because she and her spouse were traveling to a particular Caribbean country and needed a COVID-19 test result to return to the United States. (PSR ¶ 40). The customer explained, in sum and substance, that if they could show they had recovered from COVID-19 in the last 90 days, it would "prevent a lot of headaches." (PSR ¶ 40). The customer said they needed the positive test to be dated "in late May because we're going in mid-August." (PSR ¶ 40). At that time, the CDC required international air travelers to the United States to show proof of a negative COVID-19 test within the past three days or a positive COVID-19 test within the past 90 days, coupled with a letter from a healthcare provider or public health official that the person was cleared to travel. (PSR ¶ 40). The defendant then provided this customer supposed results for two positive COVID-19 tests,

which had supposedly been completed on or about May 26, 2021, over a month before the customer had contacted the defendant. (PSR ¶ 40).

In addition to backdated and fraudulent positive PCR results, the defendant offered to provide negative PCR test results to individuals who had not received a negative PCR test. (PSR ¶ 41). Like with the fraudulent positive PCR results, the defendant knew that her customers were using the fraudulent negative PCR results for a variety of purposes, including to obtain medical procedures and to travel internationally to countries such as Israel. (PSR ¶ 42). In order to make the fraudulent negative PCR results using a variety of methods, including changing patient names on PDFs of legitimate test results showing the desired negative result or sending COVID-19 tests to a laboratory that purported to be a sample from the customer but had not, in fact, been obtained from anyone. (PSR ¶ 43).

On one occasion, on or about November 28, 2021, the defendant instructed an individual employed by Healthcare Logics to submit fraudulent COVID-19 tests to a laboratory. (PSR ¶ 44). The defendant explained, over voice memos and messages on WhatsApp, how to create fraudulent positive and negative PCR results using materials and control samples provided by the laboratory to Healthcare Logics. (PSR ¶ 44). As to the positive test, the defendant instructed the employee to "us[e] one of the red sticks from the rapid kits" and to "just put that into the tube instead of you know obviously swabbing with it." (PSR ¶ 44). For the negative tests, the defendant told the employee that it was "[a]s if you just swabbed them, but just you don't even have to put the stick in. Just take those orange tubes. Put the name and date of birth on each. Write up the rec sheet. And send it in as if it was swabbed. It's fine." (PSR ¶ 44). The employee followed the defendant's instructions and did not swab any of the people supposedly being tested. (PSR ¶ 44). Instead, the employee sent one test that was intended to have a positive result and two tests that were intended to have negative results to the laboratory. (PSR ¶ 44).

## II.     Procedural History and Plea Agreement

On April 19, 2023, a grand jury sitting in this District returned an indictment charging the defendant with three counts related to the fraudulent vaccination record card scheme: forgery of government writings, in violation of 18 U.S.C. §§ 494 and 2 (Count One); fraud in connection with identification documents, in violation of 18 U.S.C. §§ 1028(a)(7), 1028(b)(1)(D), and 2 (Count Two); and making false statements, in violation of 18 U.S.C. § 1001(a)(2) (Count Three). The indictment also charged the defendant with one count of healthcare fraud, in violation of 18 U.S.C. §§ 1347 and 2 (Count Four), related to the fraudulent testing scheme.

On May 30, 2024, the defendant pled guilty to Count One, forgery of government writings, and stipulated to the conduct described in Count Four, healthcare fraud. In her plea agreement, the parties agreed that the defendant's Guidelines range for Count One and the Count Four stipulated conduct is six to 12 months' imprisonment, based on an offense level of 10 and a Criminal History Category of I. In the PSR, the Probation Office has independently reached the same conclusion as to the applicable Guidelines range.

### III. Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)–(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant;
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### IV. A Guidelines Sentence Is Appropriate and Necessary

The Government respectfully submits that a sentence within the Guidelines range of six to 12 months' imprisonment is sufficient, but not greater than necessary, to serve the purposes of sentencing, particularly in light of the factors highlighted below.

*First*, the nature and seriousness of the offenses, as well as the circumstances of the offenses, warrants a significant sentence. *See* 18 U.S.C. § 3553(a)(1), (2)(A). The defendant's conduct was extremely serious. During the Delta surge—the deadliest wave of the pandemic[1]—

---

[1] Mohammad Tabatabi et al., *An Analysis of COVID-19 Mortality During the Dominancy of Alpha, Delta, and Omicron in the USA*, 14 J. Primary Care & Community Health 1, 7 (2023), https://journals.sagepub.com/doi/pdf/10.1177/21501319231170164.

the defendant sold hundreds of fraudulent COVID-19 vaccination record cards and dozens of fraudulent COVID-19 test results. She did this knowing that these fraudulent cards and results would be used to circumvent regulations and requirements in place to protect the community and attempt to limit the spread of COVID-19, and particularly the Delta variant. While financially enriching herself, the defendant enabled her customers to go to schools, travel to other countries and return to the United States, and work—including in the healthcare industry—under the guise that they were vaccinated or did not have COVID-19, giving those around the customers a false sense of security. The defendant's behavior was dangerous and easily could have led to increased infections and even deaths from COVID-19.

The defendant's selling of fraudulent COVID-19 vaccination record cards and test results did not represent a one-time mistake. Instead, for over a year, beginning in January 2021, she sold fraudulent COVID-19 test results. And when regulations and mandates increased later in 2021 because of the Delta wave, she double down on her fraud, expanding her practice to selling forged vaccination record cards, as well as tests. While the defendant is entitled to have her own views regarding the vaccine, she must be punished for acting on those beliefs in a way that created a deadly public health risk, day after day, during one of the most precarious times in the health of the country.

*Second*, the need for deterrence—both specific and general—strongly weighs in favor of a meaningful term of imprisonment. 18 U.S.C. § 3553(a)(2)(B). Specific deterrence is important because the defendant engaged in this conduct knowing full well that what she was doing was wrong. She has been involved in the healthcare industry for much of her career, and instead of using her knowledge and skills to care for others during a global pandemic, she instead weaponized what she had learned to help a deadly disease spread. In addition, the defendant has proved—within the past year—that she is willing and able to defy court orders. As alleged in a Nassau County felony complaint, last June, the defendant took her three teenage children from the lawful custody of her ex-husband and moved them to Texas. (PSR ¶ 68). Shortly thereafter, a Nassau County judge issued an order stating that the defendant must return to New York with the children, but the defendant failed to do so. (PSR ¶ 68). She defied this order for nearly a year, until she ultimately returned to New York for the plea hearing in this case and was arrested by Nassau County officials.

In this case, however, general deterrence may be even more important than specific deterrence. A significant sentence is necessary to send a message that the legal system will not tolerate conduct that presents public health dangers, whether related to COVID-19 (which is yet again surging)[2] or any future pandemic. If the defendant were to receive the non-incarceratory sentence she seeks, there would be little reason for others who are considering engaging in this type of fraud to be deterred from doing so. By sentencing the defendant to a significant term of incarceration, the Court would be in line with other cases in which defendants have sold fraudulent COVID-19 vaccination record cards and/or tests, sending the message that this conduct will not be tolerated. Such a sentence would be in line with similar cases across the country. *See, e.g.*,

---

[2] Brenda Goodman, *The US Is Experiencing Its Largest Summer Covid Wave in at Least Two Years*, CNN (Aug. 16, 2024), https://www.cnn.com/2024/08/16/health/covid-largest-summer-wave/index.html.

*United States v. Rodriguez*, 22 Cr. 70 (E.D.N.Y.) (defendants sentenced to 30 months' and 21 months' imprisonment for their role in scheme to sell over 300 COVID-19 vaccination record cards); *United States v. Mazi*, 22 Cr. 036 (N.D. Cal.) (defendant sentenced to 33 months' imprisonment for selling COVID-19 vaccination record cards to over 200 individuals and providing immunization pellets to customers, which she claimed would provide immunity from COVID-19); *United States v. Van Camp*, 22 Cr. 72 (W.D. Wash.) (defendant sentenced to 6 months' imprisonment for producing and selling fake COVID-19 vaccination record cards to over 2,000 individuals); *United States v. Barnard*, 22 Cr. 469 (N.D. Tex.) (sentences ranging from 30 months' to 84 months' imprisonment for defendants who participated in scheme to defraud insurance companies of over $7 million for COVID-19 tests never performed).

*Third*, the history and characteristics of the defendant warrant such a sentence. *See* 18 U.S.C. § 3553(a)(1). According to the Presentence Investigation Report, the defendant reported having a supportive family—the defendant described "her father is her biggest cheerleader, and her mother is her best friend"; her siblings are "very upstanding" citizens—who are aware of this case and continue to offer their support. (PSR ¶¶ 71-72). Indeed, the defendant "described her upbringing as 'great,' [and] her parents as 'really good' people," and said that "her basic needs were always met" and that she did not experience "any types of abuse or neglect throughout her childhood." (PSR ¶ 73). Unlike many of the defendants this Court sees, the defendant's past therefore offers no mitigation or explanation for her current conduct. Instead of taking advantage of the opportunities she was presented, the defendant engaged in this dangerous and fraudulent conduct during the pandemic to satisfy her own greed.

The defendant argues that a sentence of probation is appropriate because (i) she is the mother of three teenage children; (ii) of her age and mental and physical health conditions; (iii) her history of employment and future employment prospects; (iv) her acceptance of responsibility and efforts at rehabilitation; and (v) her good works and military service for the Israel Defense Forces ("IDF"). (Dkt. 54 ("Def. Submission") at 5-13). Whatever the merits of these arguments, none warrants the non-incarceratory sentence she seeks.[3]

*First*, the defendant argues that a non-incarceratory sentence is warranted because of the impact an incarceratory sentence could have on her three teenage children. (Def. Submission at 6). But the defendant had these children—whom she describes as "amazing" and "her whole world" (PSR ¶ 81)—at the time she engaged in the conduct, which should have deterred her from selling forged COVID-19 cards and test results in the first place. In addition, if the defendant is incarcerated for some period of time, there are others who can care for the children. Indeed, the defendant's ex-husband has residential custody of the three children (and it appears the only reason the children were not living with him for the past year was that the defendant fled to Texas with the children in contravention of a court order out of Nassau County). (PSR ¶ 68). The children

---

[3] If the Court nevertheless finds that a non-incarceratory sentence is appropriate, the Guidelines state that a sentence of probation is authorized if "the applicable guidelines range is in Zone B of the Sentencing Table," as the defendant's is, "*and* the court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention" sufficient to satisfy the minimum term of imprisonment specified in the Guidelines range (here, at least six months). U.S.S.G. § 5B1.2(a)(2) & app. n.1(B).

have recently been living with the defendant's sister after the defendant was arrested for violating this court order. (*See* PSR ¶¶ 68, 77).

*Second*, the defendant argues that a non-custodial sentence is appropriate because of her mental and physical health conditions, including a recent skin cancer diagnosis, and age. (Def. Submission at 6-10). While the Court can and should take these factors into account in sentencing the defendant, they do not justify *no* prison time whatsoever. As to the concern of health conditions, the Bureau of Prisons ("BOP") has seven medical centers, including one for female offenders (FMC Carswell), that provide services such as chemotherapy, pain management, dialysis, hospice care, and chronic care for seriously ill inmates. In addition to these medical centers, the BOP's general population institutions have health services departments and chronic care clinics, which provide routinely scheduled care to medically ill inmates, as well as contracts with local medical centers to provide specialized medical treatment as needed. All inmates who enter BOP institutions are screened for physical and mental health conditions and are monitored thereafter through follow-up appointments and chronic care clinics as necessary.

As to age, it is true that "older offenders," defined as offenders 50 years old or older, have a lower rate of recidivism than younger offenders. United States Sentencing Commission, Older Offenders in the Federal System 5, 44 (July 2022), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf. But the defendant was 40 years old when she engaged in the instant offense, and therefore does not fall into that "older offenders" category. And the nature of her crimes, which were enabled by her employment and experience in the healthcare industry, are the type of crimes that the defendant will continue to have the opportunity to commit as she grows older.

*Third*, the defendant further argues for a non-custodial sentence based on her work history, "including roles as a healthcare professional," and her prospects for future employment, which she claims will be "significantly affect[ed]" by this conviction. (Def. Submission at 9-10). While it is positive that the defendant has been previously employed, it was the nature of this work in the healthcare industry that gave her the knowledge and opportunity to commit these crimes. In addition, with regard to her future employment, since being arrested, the defendant has, commendably, started two jobs and received an offer for a third (*see* PSR ¶¶ 119-20; Def. Submission, Ex. E), suggesting that she will be able to find work moving forward.

*Fourth*, the defendant also points to her acceptance of responsibility and rehabilitation as reasons for a non-custodial sentence. (Def. Submission at 10-12). Again, both of these are commendable, but her acceptance of responsibility is already factored into her Guidelines range, and her efforts at rehabilitation, including finding a job and making a Facebook group for veterans, do not rise to the level that would justify a non-incarceratory term of imprisonment.

*Finally*, the defendant argues that her good works, including volunteering with the U.S. Navy during the pandemic, and her military service with the IDF warrant a probationary sentence. (Def. Submission at 12-13). While these acts are admirable, the defendant's two years of service in Israel's military approximately 25 years ago and her month of service aboard the USNS Comfort when it was docked in New York Harbor do not warrant a sentence without a term of incarceration. (PSR ¶¶ 116-17). The defendant's description of the latter to the Probation Office suggests that she may be exaggerating her service, as she claimed that she "was a discharge planner receiving

30 to 40 discharges daily" on the Comfort (PSR ¶ 117), although over the course of three-and-half weeks, only 182 patients were treated on the Comfort—a ship with 1,000 beds that were largely left unused. *See* Joe Simkins, *Hospital Ship Comfort Departs NYC, Having Treated Fewer Than 200 Patients*, NavyTimes (Apr. 30, 2020), https://www.navytimes.com/news/your-navy/2020/04/30/hospital-ship-comfort-departs-nyc-having-treated-fewer-than-200-patients/; Michael Shwirtz, *The 1,000-Bed Comfort Was Supposed to Aid New York. It Has 20 Patients.*, N.Y. Times (Apr. 2, 2020), https://www.nytimes.com/2020/04/02/nyregion/ny-coronavirus-usns-comfort.html. The defendant also claims that "Governor Cuomo requested her assistance, and [that] she began an alliance between medical professionals and politicians by helping politicians understand medically what was needed during the pandemic, and vice versa," (PSR ¶ 117), which the Government can find no public record of. Such exaggeration would be in line with her conduct in this case, in which she claimed, for example, to be a nurse although she was not. Even crediting her description of her service of COVID-19 patients on the Comfort, this should have led her to assist COVID-19 patients by slowing the spread of the virus, not increasing it by selling fraudulent COVID-19 vaccination record cards and test results for financial gain.

## V.     Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a Guidelines sentence of six to 12 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: *[signature]*
Madison Reddick Smyser
Assistant United States Attorney
(212) 637-2381